Richard J. Nebuda et al., appellants, v.
Dodge County School District 0062
(Scribner-Snyder Community Schools)
in the State of Nebraska, appellee.

___ N.W.2d ___

Filed April 23, 2015.    No. S-14-477.

1. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.
2. **Statutes.** The meaning and interpretation of a statute presents a question of law.
3. **Judgments: Justiciable Issues.** A justiciability issue that does not involve a factual dispute presents a question of law.
4. **Moot Question: Jurisdiction: Appeal and Error.** Although mootness does not always preclude appellate jurisdiction, it is a justiciability doctrine that weighs against rendering a decision that will no longer have an impact on a live dispute between the parties.
5. **Moot Question.** Mootness refers to events occurring after the filing of a suit which eradicate the requisite personal interest in the dispute's resolution that existed at the beginning of the litigation.
6. **Moot Question: Words and Phrases.** A moot case is one which seeks to determine a question that no longer rests upon existing facts or rights—i.e., a case in which the issues presented are no longer alive.
7. **Moot Question.** The central question in a mootness analysis is whether changes in circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief.
8. ____. A case is not moot if a court can fashion some meaningful form of relief, even if that relief only partially redresses the prevailing party's grievances.
9. **Injunction: Intent.** Injunctive relief is intended to prevent future harm and is not available when the act complained of is already completed.
10. **Moot Question: Injunction.** A court's inability to grant injunctive relief does not necessarily render a claim for declaratory relief moot.
11. **Declaratory Judgments: Justiciable Issues.** A plaintiff's interest in a declaratory judgment action must be more than the satisfaction of having a court declare that the defendant's conduct was wrong. The declaration must be relevant to a live controversy or threat of harm.
12. **Moot Question.** A case becomes moot when the issues initially presented in litigation cease to exist or the litigants lack a legally cognizable interest in the litigation's outcome.
13. ____. Unless an exception applies, a court or tribunal must dismiss a moot case when changed circumstances have precluded it from providing any meaningful relief because the litigants no longer have a legally cognizable interest in the dispute's resolution.
14. ____. Nebraska recognizes a public interest exception to the mootness doctrine.
15. **Moot Question: Appeal and Error.** Under the public interest exception to mootness, an appellate court can review an otherwise moot case if it involves a matter

affecting the public interest or when other rights or liabilities may be affected by its determination.

16. ____: ____. When determining whether a case involves a matter of public interest, an appellate court considers (1) the public or private nature of the question presented, (2) the desirability of an authoritative adjudication for future guidance of public officials, and (3) the likelihood of future recurrence of the same or a similar problem.

17. ____: ____. A party's strategic mistakes do not preclude an appellate court's review under the public interest exception to mootness when the issues on appeal require a generic statutory analysis instead of a fact-specific inquiry unique to the parties.

18. **Statutes: Appeal and Error.** Absent a statutory indication to the contrary, an appellate court gives words in a statute their ordinary meaning.

19. **Statutes: Legislature: Intent: Appeal and Error.** An appellate court will not look beyond a statute to determine the legislative intent when the words are plain, direct, or unambiguous.

20. **Bonds: Words and Phrases.** Generally, a governmental entity's issuing of bonds refers to its offering and delivery of certificates of indebtedness for sale in a market to raise money for improvements—not to executing an instrument of indebtedness to a single lender.

21. **Statutes: Judicial Construction: Legislature: Presumptions: Intent.** When judicial interpretation of a statute has not evoked a legislative amendment, an appellate court presumes that the Legislature has acquiesced in the court's interpretation.

Appeal from the District Court for Dodge County: GEOFFREY C. HALL, Judge. Affirmed.

Jovan W. Lausterer, of Bromm, Lindahl, Freeman-Caddy & Lausterer, for appellants.

James B. Gessford, Gregory H. Perry, and Derek A. Aldridge, of Perry, Guthery, Haase & Gessford, P.C., L.L.O., for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, STEPHAN, McCORMACK, MILLER-LERMAN, and CASSEL, JJ.

CONNOLLY, J.

## SUMMARY

After the voters in the appellee school district rejected a bond proposal to build an addition, the school district entered into a lease-purchase agreement with Scribner Bank to finance an addition. The appellants, residents and taxpayers in the

district, sought declaratory and injunctive relief. The taxpayers contend that the agreement violates Neb. Rev. Stat. § 79-10,105 (Reissue 2012).

After a trial, the district court denied relief and dismissed the taxpayers' complaint. It concluded that under § 79-10,105, we have upheld the use of lease-purchase agreements to make school improvements without the voters' approval if the project is not funded by bonded debt. The court found that the school district had not funded the project through bonded indebtedness.

Because the addition has been completed, we address the issues presented under the public interest exception to the mootness doctrine. We conclude that a lease-purchase agreement is not the issuance of a bond under § 79-10,105. We affirm.

## BACKGROUND

Dodge County School District 0062, Scribner-Snyder Community Schools, is a Class III school district. At some point in 2009, the State Fire Marshal declared that the high school building had several safety concerns and code deficiencies. The marshal gave the district until January 2014 to make corrections. The district's superintendent worked with an architectural firm and construction manager to obtain cost estimates for their work on improvements and then made recommendations to the board for a bond proposal.

In March 2012, the voters rejected a $7.5 million bond proposal to construct additional classrooms and renovate the existing building. Afterward, the district asked the construction company and architectural firm to modify its project. The new plan called for adding an additional six classrooms in a detached preengineered metal building. The estimated construction cost was $623,000. The district did not submit a bond proposal to the voters for the modified project. The school board president testified that the district had funds to pay for the modified project but that it could not have done so without borrowing money to pay its monthly bills.

In June 2012, the school board passed a resolution to authorize the superintendent to create a nonprofit "leasing" corporation, which would be controlled by the district, to make the improvements and lease the building back to the district. The superintendent and two school board members served as the corporation's board of directors. The resolution stated that it did not constitute the board's final approval of the project's financing or the leasing corporation's issuance of any bond obligations. In July, the school board authorized a lease-purchase agreement with the leasing corporation. The leasing corporation's board then approved a resolution authorizing the corporation to issue "certificates of participation" to a bond underwriter to solicit buyers. The leasing corporation intended to raise a maximum principal of $750,000 through bonds with a maximum interest rate of 3 percent. When the underwriter sought interested buyers (primarily banks), Scribner Bank expressed interest in "buying" the entire lease-purchase agreement.

In October 2012, the school board received construction bids and the taxpayers filed their complaint, alleging that the lease-purchase agreement with the leasing corporation violated § 79-10,105. They sought a declaration that the district's lease-purchase agreement was unlawful and an injunction barring the district from taking action in furtherance of the agreement. They did not seek a temporary restraining order.

On November 1, 2012, the district changed course and entered into a lease-purchase agreement with Scribner Bank, which agreed to finance the project (the addition and its equipment). The leasing corporation never issued any bond certificates. The new lease-purchase agreement called for the district to lease the building site to the bank so that the bank could make and pay for the improvements, with the district acting as the bank's agent in making the improvements. The bank agreed to pay the costs of the project up to $750,000. The district was unconditionally obligated to pay the "Base Rentals" and "Additional Rentals." The base rental payments were set out in a schedule to repay $750,000 in principal

plus interest. The parties incorporated the legal fees and underwriter fees for the original bond program into the principal indebtedness. The additional rental payments were the district's obligations to pay for taxes, utilities, insurance, and legal fees.

The agreement provided that the lease term ended in November 2019 or upon the earliest of four events: (1) the month in which the district paid its base rental obligation; (2) August 31 of any fiscal year in which the district failed to appropriate payments toward its obligations; (3) the date on which the district purchased the leased property by paying for the base rentals and additional rentals; or (4) upon the district's default on its obligations. If a default occurred, the district's accrued obligations continued and it lost the right to possess the leased property. It agreed to vacate the site and return the equipment to the bank if it defaulted. The attorney who prepared the lease-purchase agreement testified as a bond expert for the district and stated that the agreement did not constitute a bond. But he admitted that the interest paid to the bank was tax-exempt income for the bank, just like the interest paid on bonds.

In a separate project construction agreement, the bank agreed to make the planned improvements, with the school district acting as its agent. The bank did not participate in the design and work decisions. In a site lease agreement, the district leased the school building and the property underlying the proposed addition to the bank for $1 for the entire lease period. In this agreement, the district warranted that the site was not subject to any encumbrances and not threatened by environmental hazards. Before signing these agreements, the district paid for surveying work and an environmental study. It had also paid for an architectural firm's services. On November 12, 2012, the school board explicitly abandoned its plan to finance the project through its leasing corporation by repealing the authorizing resolution. On the same day, the construction company and the architectural firm signed addendums to their agreements with the school district. They acknowledged that the district had assigned its rights and obligations under

the original agreements to the bank and would be working as the bank's agent.

The project was completed in August 2013, before the trial began in September. The evidence showed that the detached building was built in sections at a factory, assembled at the site, and set in a permanent foundation. The district planned to pay its obligations within 4 to 5 years. It was making payments out of a special building fund at the time of trial but intended to make payments out of its general funds.

After a bench trial, the court issued an order that denied relief for the taxpayers and dismissed their complaint. The court concluded that the Legislature had acquiesced in this court's interpretations of § 79-10,105 in *George v. Board of Education*[1] and *Foree v. School Dist. No. 7*.[2] It reasoned that in *Foree*, we did not interpret § 79-10,105 to preclude a school from entering into a lease-purchase agreement for school improvements. The court further noted that in *Banks v. Board of Education of Chase County*,[3] this court held that architectural fees are general expenses, not building expenditures that a school district must submit to the voters. It stated that the taxpayers would have been better served by a transparent discussion and input from the taxpayers and that the school board's actions appeared to be a "back-door effort to circumvent the will of the voters." But it concluded that we have held "the lease purchase of a school building is allowed without the vote of the people if the project is not funded by bonded debt." It concluded that because there was no evidence that this had occurred, the taxpayers' claim failed.

## ASSIGNMENTS OF ERROR

The taxpayers assign, restated and reduced, that the district court erred as follows:

---

[1] *George v. Board of Education*, 210 Neb. 127, 313 N.W.2d 259 (1981).

[2] *Foree v. School Dist. No. 7*, 242 Neb. 166, 493 N.W.2d 625 (1993).

[3] *Banks v. Board of Education of Chase County*, 202 Neb. 717, 277 N.W.2d 76 (1979).

(1) considering the school district's safety concerns and code deficiencies;

(2) failing to consider that before the district entered into its lease-purchase agreement with Scribner Bank, it had entered into or approved an architectural agreement, construction agreement, final construction design, site survey, environmental study, and construction bids;

(3) failing to consider testimony that the district could not relocate significant parts of the project;

(4) considering the district's attempt to retroactively rescind its prior acts;

(5) concluding that the Legislature had acquiesced in this court's decision in *George*[4] when that decision preceded the 1985 amendment to § 79-10,105;

(6) concluding that the Legislature had acquiesced in *Banks*[5] when *Banks* preceded the 1985 amendment to § 79-10,105;

(7) failing to conclude that *Foree*[6] is distinguishable and does not apply to lease-purchase agreements for the construction of a school building;

(8) finding that the lease-purchase agreement here was not funded by bonded debt;

(9) concluding that our case law permits a school district to construct a school building through a lease-purchase agreement;

(10) admitting exhibit 47, because it contains legal conclusions by an attorney for the school district, and overruling the taxpayers' objections to legal conclusions by an attorney testifying for the district.

## STANDARD OF REVIEW

[1-3] We independently review questions of law decided by a lower court.[7] The meaning and interpretation of a statute

---

[4] *George, supra* note 1.

[5] *Banks, supra* note 3.

[6] *Foree, supra* note 2.

[7] See *Kelliher v. Soundy*, 288 Neb. 898, 852 N.W.2d 718 (2014).

presents a question of law.[8] A justiciability issue that does not involve a factual dispute also presents a question of law.[9]

## ANALYSIS

### Taxpayers' Claims Are Moot

[4] Although mootness does not always preclude appellate jurisdiction,[10] it is a justiciability doctrine that weighs against rendering a decision that will no longer have an impact on a live dispute between the parties.[11] So we first address the district's claim that the taxpayers' claims on appeal are moot. It argues that the taxpayers never sought a temporary restraining order to stop the project from proceeding and that injunctive relief could no longer bar any district actions. Additionally, the district argues that the taxpayers' request for declaratory relief is moot because they did not seek repayment of any illegally expended funds under the lease-purchase agreement.

[5-8] Mootness refers to events occurring after the filing of a suit which eradicate the requisite personal interest in the dispute's resolution that existed at the beginning of the litigation.[12] A moot case is one which seeks to determine a question that no longer rests upon existing facts or rights—i.e., a case in which the issues presented are no longer alive.[13] The central question in a mootness analysis is whether changes in circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief.[14] A case is not moot if a court can fashion some meaningful form of

---

[8] See *McDougle v. State ex rel. Bruning*, 289 Neb. 19, 853 N.W.2d 159 (2014).

[9] *Blakely v. Lancaster County*, 284 Neb. 659, 825 N.W.2d 149 (2012).

[10] See, e.g., *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

[11] See, *Blakely, supra* note 9; 13B Charles Alan Wright et al., Federal Practice and Procedure § 3533 (2008).

[12] *Blakely, supra* note 9.

[13] *Id.*

[14] *In re Interest of Nathaniel M.*, 289 Neb. 430, 855 N.W.2d 580 (2014).

relief, even if that relief only partially redresses the prevailing party's grievances.[15]

[9] In *Rath v. City of Sutton*,[16] we addressed a mootness problem arising from the plaintiff's unsuccessful action to enjoin a city's construction project because the city had unlawfully awarded the contract to a contractor who did not submit the lowest bid. While the case was pending on appeal, the project was completed. We explained that injunctive relief is intended to prevent future harm and is not available when the act complained of is already completed. So, "any opinion on the court's denial of injunctive relief would be 'worthless.' . . . Simply put, we lack the power, 'once a bell has been rung, to unring it.'"[17] We concluded that the plaintiff's claim for injunctive relief was moot.

[10] We also explained that a court's inability to grant injunctive relief does not necessarily render a claim for declaratory relief moot. But we rejected the plaintiff's argument that he was entitled to declaratory relief because if he prevailed, he could then seek to recover funds that the city paid out under an illegal contract. We concluded that he was required to specifically allege in his complaint that he was entitled to recoup the funds and had not done so. Thus, the declaratory judgment claim was also moot because the declaration would have been advisory, with no effect on the plaintiff's rights.

[11,12] In sum, a plaintiff's interest in a declaratory judgment action must be more than the satisfaction of having a court declare that the defendant's conduct was wrong. The declaration must be relevant to a live controversy or threat of harm. A case becomes moot when the issues initially presented in litigation cease to exist or the litigants lack a legally cognizable interest in the litigation's outcome.[18]

As in *Rath*, we cannot provide any relief to the taxpayers. Injunctive relief is not available to them because the

---

[15] *Blakely, supra* note 9.

[16] *Rath v. City of Sutton*, 267 Neb. 265, 673 N.W.2d 869 (2004).

[17] *Id*. at 273, 673 N.W.2d at 880 (citations omitted).

[18] *State v. Johnson*, 287 Neb. 190, 842 N.W.2d 63 (2014).

construction under the lease-purchase agreement that they challenged was already completed by the time of trial. And like the taxpayer in *Rath*, they did not allege that they were entitled to recoup any illegal expenditures. Because declaratory relief would not affect a live controversy, the taxpayers no longer have a cognizable interest in the appeal.

## Public Interest Exception
### to Mootness Applies

[13,14] Unless an exception applies, a court or tribunal must dismiss a moot case when changed circumstances have precluded it from providing any meaningful relief because the litigants no longer have a legally cognizable interest in the dispute's resolution.[19] Nebraska recognizes a public interest exception to the mootness doctrine,[20] and we consider its application here.

[15,16] Under the public interest exception to mootness, we can review an otherwise moot case if it involves a matter affecting the public interest or when other rights or liabilities may be affected by its determination.[21] When determining whether a case involves a matter of public interest, we consider (1) the public or private nature of the question presented, (2) the desirability of an authoritative adjudication for future guidance of public officials, and (3) the likelihood of future recurrence of the same or a similar problem.[22]

In *Rath*, we concluded that the public interest exception applied to two issues presented by the appeal: (1) the proof required to establish an irreparable harm based on an alleged illegal expenditure of public funds and (2) the meaning of the statutory phrase "lowest responsible bidder." We concluded that a decision on the proof question was obviously of paramount importance to Nebraska's taxpayers and would provide needed guidance because we had not previously decided the

---

[19] *Professional Firefighters Assn. v. City of Omaha*, 282 Neb. 200, 803 N.W.2d 17 (2011).

[20] See *id*.

[21] *In re Trust Created by Nabity*, 289 Neb. 164, 854 N.W.2d 551 (2014).

[22] *In re Interest of Thomas M.*, 282 Neb. 316, 803 N.W.2d 46 (2011).

question. We further concluded that the issue was likely to recur because taxpayers frequently filed suits to enjoin illegal expenditures.

Similarly, we concluded that (1) the statutory interpretation question was of a public nature, because competitive bidding statutes exist to protect the public and the taxpayer had commenced the suit on behalf of the public; (2) our interpretation would provide guidance to all state entities and officials charged with procuring products and services; and (3) the issue was likely to recur because of frequent disputes over public contracting.

[17] Finally, in *Rath*, we rejected the city's argument that we should not apply the exception because the taxpayer failed to take actions to prevent the claim from becoming moot. We concluded that a party's strategic mistakes do not preclude our review under the public interest exception to mootness when the issues on appeal require a generic statutory analysis instead of a fact-specific inquiry unique to the parties.

This reasoning from *Rath* also applies here. The meaning of § 79-10,105 unquestionably involves a matter affecting the public interest because it governs whether taxpayers in every school district can be taxed for capital improvements without their approval of the expenditure. Although we previously considered this issue in *Foree*, the taxpayers argue that *Foree* is factually distinguishable. Finally, despite the district's argument in its brief, at oral argument, its attorney stated that many school districts have used lease-purchase agreements to make capital improvements and that others are looking for further guidance from this decision. We conclude that the requirements for the public interest exception to mootness are satisfied and address the merits of the taxpayers' appeal.

### 3. § 79-10,105 Does Not Require Voter Approval for All Lease-Purchase Agreements Exceeding $25,000

Despite the taxpayers' multiple assignments of error, the central issue in this appeal is whether the district's lease-purchase

contract with Scribner Bank to finance capital improvements violated § 79-10,105, which provides the following:

> The school board or board of education of any public school district may enter into a lease or lease-purchase agreement for the exclusive use of its individual jurisdiction for such buildings or equipment as the board determines necessary. Such lease or lease-purchase agreements may not exceed a period of seven years, except that lease-purchase agreements entered into as part of an energy financing contract pursuant to section 66-1065 may not exceed a period of thirty years. All payments pursuant to such leases shall be made from current building funds or general funds. *No school district shall directly or indirectly issue bonds to fund any such lease-purchase plan for a capital construction project exceeding twenty-five thousand dollars in costs unless it first obtains a favorable vote of the legal voters pursuant to Chapter 10, article 7.* This section does not prevent the school board or board of education of any public school district from refinancing a lease or lease-purchase agreement without a vote of the legal voters for the purpose of lowering finance costs regardless of whether such agreement was entered into prior to July 9, 1988.

(Emphasis supplied.)

The taxpayers' argument focuses on the italicized language in the above quote, which was added in 1985 to the precursor of § 79-10,105.[23] They argue that through this amendment, the Legislature intended to bar school districts from using lease-purchase agreements as a way to avoid requirements for voter approval of construction projects that cost more than $25,000. They point to senators' arguments during the 1985 floor debate that they contend support their interpretation. And they argue that the definition of a "bond" broadly includes a

---

[23] See, Neb. Rev. Stat. § 79-4,154 (Reissue 1981); 1996 Neb. Laws, L.B. 900, § 751 (renumbering statute); Legislative Journal, 89th Leg., 1st Sess. 1974-76 (Apr. 30, 1985) (adding amendment language to L.B. 633).

"certificate or evidence of a debt on which the issuing company or governmental body promises to pay the bondholders a specified amount of interest for a specified length of time, and to repay the loan on the expiration date."[24]

The school district contends that under our decision in *Foree*, the 1985 amendment's restriction applies only when a school district directly or indirectly issues bonds to fund a lease-purchase plan for a capital construction project, which did not happen here. The taxpayers counter that *Foree* is distinguishable because the school district used a lease-purchase agreement to acquire modular units, not to construct a building.

[18,19] Absent a statutory indication to the contrary, we give words in a statute their ordinary meaning.[25] We will not look beyond a statute to determine the legislative intent when the words are plain, direct, or unambiguous.[26] So we first consider whether the meaning of the 1985 amendment to the precursor of § 79-10,105 is clear from the text itself: "No school district shall directly or indirectly issue bonds to fund any such lease-purchase plan for a capital construction project exceeding twenty-five thousand dollars in costs unless it first obtains a favorable vote of the legal voters pursuant to Chapter 10, article 7."

Section 79-10,105 is one of many statutes dealing with a school district's "Site and Facilities Acquisition, Maintenance, and Disposition."[27] It is true that neither § 79-10,105 nor any of the other statutes in this section define the word "bond" for applying the 1985 restriction on the issuing of bonds. But we disagree for three reasons that the word "bond" in the amendment has the broad meaning that the taxpayers assign to it.

First, the taxpayers' interpretation of § 79-10,105 is contrary to statutory interpretation principles. If the Legislature had meant for school districts to obtain the voters' approval before

---

[24] See Black's Law Dictionary 178 (6th ed. 1990).

[25] *Coffey v. Planet Group*, 287 Neb. 834, 845 N.W.2d 255 (2014).

[26] *Id.*

[27] See Neb. Rev. Stat. §§ 79-1094 to 79-10,136 (Reissue 2014).

entering into any lease-purchase agreement exceeding $25,000, it would have simply stated that. This supports the school district's argument that the restriction is focused on the issuing of bonds.

Moreover, the taxpayers' interpretation of § 79-10,105 — to include a lease-purchase agreement as the issuing of a bond — gives the amendment a nonsensical reading: "No school district shall directly or indirectly issue bonds [i.e., any instrument of indebtedness, including a lease-purchase agreement] to fund any such lease-purchase plan for a capital construction project exceeding twenty-five thousand dollars" without voter approval.

[20] Obviously, no district enters into a lease-purchase agreement to fund a lease-purchase agreement. So this interpretation renders the language absurd or the reference to the issuing of bonds meaningless, and we attempt to avoid both results when interpreting statutes.[28] Because the taxpayers' broad interpretation of the word bond renders the amendment nonsensical, it illustrates that the restriction on the *issuing of* bonds has a different meaning than the word "bond" standing alone. That is, the word bond in this context does not mean any debt obligation. Government entities do not "issue" all instruments of debt. Generally, a governmental entity's issuing of bonds refers to its offering and delivery of certificates of indebtedness for sale in a market to raise money for improvements — not to executing an instrument of indebtedness to a single lender.[29]

Second, even if the amendment could be construed as ambiguous, the legislative history of the original 1985 bill to amend the statute does not support the taxpayers' argument. It shows that the Legislature intended to preclude school

---

[28] See, *Stick v. City of Omaha*, 289 Neb. 752, 857 N.W.2d 561 (2015); *In re Interest of Nedhal A.*, 289 Neb. 711, 856 N.W.2d 565 (2014).

[29] See, e.g., *Alabama Power Co. v. City of Scottsboro*, 238 Ala. 230, 190 So. 412 (1939); *Moore v. Vaughn*, 167 Miss. 758, 150 So. 372 (1933); Black's Law Dictionary 217, 960 (10th ed. 2014); 64 Am. Jur. 2d *Public Securities and Obligations* § 165 (2011); 64A C.J.S. *Municipal Corporations* § 2118 (2011).

districts from creating nonprofit corporations to issue bonds for the district's capital improvements without a bond election, which obligation the district repays through a lease-purchase agreement with its own corporation.[30] But that did not happen here. It is true that the district attempted this maneuver, but the school board repealed the resolution that created its leasing corporation and abandoned that plan. The leasing corporation never issued any bond certificates to finance the construction project.

Third, and most important, the district court correctly concluded that the Legislature has acquiesced in our 1993 interpretation of § 79-10,105 in *Foree*. Although the taxpayers argue that the court erred in relying on our 1981 decision in *George*, because it preceded the 1985 amendment, the court correctly reasoned that understanding *George* was relevant to understanding the holding in *Foree*.

In *George*, the school district formed a "Building Corporation" that issued bonds for a school addition and then "donated" the addition to the school at the end of a 5-year lease term.[31] We rejected the taxpayer's argument that the school district had no power to issue bonds without the voters' approval because the district had not issued any bonds. We also rejected the argument that the building corporation was a sham because the Legislature had specifically authorized this method of financing under the lease-purchase statute.

After the 1985 amendment, we decided *Foree*.[32] There, the school district entered into a 4-year "'Equipment Lease/Purchase Agreement'" with a corporation for the "lease/purchase of eight modular homes for use as classrooms."[33] The taxpayer argued that the agreement was invalid under the

---

[30] See, Introducer's Statement of Intent, L.B. 50, Committee on Education, 89th Leg., 1st Sess. (Mar. 18, 1985); Committee on Education Hearing, L.B. 50, 89th Leg., 1st Sess. 46 (Mar. 18, 1985); Floor Debates, 1st Sess. 3790-91 (Apr. 19, 1985) and 1st Sess. 4429-30 and 4436-37 (Apr. 30, 1985).

[31] *George, supra* note 1, 210 Neb. at 128, 313 N.W.2d at 260-61.

[32] *Foree, supra* note 2.

[33] *Id.* at 167, 493 N.W.2d at 625.

amended lease-purchase statute and that the Legislature had amended the statute in response to our decision in *George*. We concluded that even if the amendment was in response to *George*, the statute, as amended, still did not require the voters' approval of a lease-purchase agreement:

> The plaintiff's principal contention seems to be that the provision requiring a favorable vote of the electorate for a direct or indirect issue of bonds to fund a lease-purchase agreement for a capital construction project exceeding $25,000 prohibits the defendant from entering into its lease-purchase agreement for the modular units. . . .
>
> While the Legislature's amendment to § 79-4,154 in 1985 may have been in response to the *George* decision, it is clear that § 79-4,154 still authorizes school districts to acquire buildings or equipment through lease-purchase agreements. See *George v. Board of Education, supra*.
>
> In the present case, no bonds were issued *directly or indirectly* by any party in order to fund the modular units. Furthermore, the defendants are not required to finance the lease/purchase of the modular units by bonds.[34]

This passage shows that we rejected the taxpayer's argument that the lease-purchase agreement was an "indirect" bond. We implicitly interpreted the issuing of bonds to mean the issuing of certificates of indebtedness to be purchased by unknown investors in a market. We further stated that the funds for the lease payments were properly budgeted. In this regard, § 79-10,105, then and now, explicitly authorizes school districts to make payments under lease-purchase agreements "from current building funds or general funds."

Contrary to the taxpayers' argument, *Foree* is not distinguishable because we said the lease-purchase statute "authorizes school districts to *acquire buildings* or equipment through lease-purchase agreements."[35] In stating this, we focused on upholding the district's challenged act—acquiring premade modular units. But the statutory language we were interpreting

---

[34] *Id*. at 168-69, 493 N.W.2d at 626-27 (emphasis supplied).

[35] *Id*. at 169, 493 N.W.2d at 626.

restricts issuing bonds "'to fund any such lease-purchase plan for a capital construction project.'"[36] So our reasoning logically applies to any capital construction project financed through a lease-purchase agreement.

[21] When judicial interpretation of a statute has not evoked a legislative amendment, we presume that the Legislature has acquiesced in the court's interpretation.[37] We recognize that other statutes that authorize expenditures for a school district's capital improvements require the voters' approval to raise the funds.[38] But any incongruity between these statutes and § 79-10,105 is a policy issue for the Legislature to resolve. Because it has not amended § 79-10,105 in response to *Foree*, we presume that it has decided the issue in accordance with that decision.

## CONCLUSION

We conclude that the taxpayers' claims for injunctive and declaratory relief are moot because they no longer have a cognizable interest in our resolution of the case. But because of the public nature of their dispute, we have resolved the issue presented under the public interest exception to the mootness doctrine. We conclude that § 79-10,105 does not prohibit a school district from entering into a lease-purchase agreement to finance a capital construction project, if it has not created a nonprofit corporation to issue bonds for the school district. Because that maneuver did not occur here, the district did not violate § 79-10,105 by entering into a lease-purchase agreement with the bank.

AFFIRMED.

---

[36] *Id*. at 168, 493 N.W.2d at 626 (quoting § 79-4,154).

[37] *Lenz v. Central Parking System of Neb*., 288 Neb. 453, 848 N.W.2d 623 (2014).

[38] See Neb. Rev. Stat. §§ 79-1098 (Reissue 2014) and 10-701 and 10-702 (Reissue 2012).